**METAL PROCESSING, INC., Plaintiff,**

**v.**

**Timothy Maxwell HUMM, An Underwriter at Lloyd's London, on Behalf of Himself and All Other Lloyd's Underwriters Subscribing to Cargo Insurance Cover Note MB 6340D00; McAllister Brothers; McAllister Tow-**

ing and Transportation Co., Inc.; Scott Paper Co.; Transportation Advisory Council, Inc.; New Jersey Steel Corporation; Intech Marine Inc.; and I.I.C. Marine Consultants, Inc., Defendants.

McAllister Towing & Transportation Co., Inc., Third–Party Plaintiff,

v.

Raritan River Terminals, Inc., Third–Party Defendant.

No. Civ. 95–1085(WGB).

United States District Court, D. New Jersey.

July 2, 1999.

John J. Walsh, Freehill, Hogan & Mahar, Jersey City, New Jersey, for defendants McAllister Brothers, Inc. and McAllister Towing and Transp. Company, Inc.

Vincent J. Barra, Barra & Salz, Allendale, New Jersey, for defendant Scott Paper Co.

## OPINION

BASSLER, District Judge.

■ This matter was tried without a jury before this Court on November 24, 1998.[1] For the reasons set forth below, the Court finds that the Defendant Scott Paper Company ("Scott"), is **liable** for $2,035,000. Furthermore, the Court finds that Scott is **not liable** for pre-judgment interest on this award.

## I. Background

In the Fall of 1992 the tug McAllister Sisters left Port Keasby, New Jersey to begin the ocean tow of the barge Atlantic Trader to San Juan, Puerto Rico. En route to Puerto Rico, the barge capsized and the entire cargo of metal rebar—steel reinforcing rods valued at approximately $2.1 million dollars—was lost. The owner of the cargo, Metal Processing, Incorporated ("Metal Processing") brought this action against McAllister Towing & Transporta-

tion Company ("McAllister"), the owner of the tug and the barge; Scott, who had agreed to transport the cargo; New Jersey Steel, who had sold the rebar; Raritan River Terminals, whom New Jersey Steel had hired to load, lash and stow the rebar on the deck of the barge; and other defendants. The defendants in turn filed cross claims. The claim of Metal Processing was eventually settled. Of the overall settlement of $2,690,000 McAllister and its underwriters paid $2,035,000. McAllister, acting for itself—and, since the settlement, its underwriters—pursues a claim for contractual indemnification against Scott.

On December 9, 1987, McAllister and Scott entered into an agreement entitled "Contract of Affreightment" (the "COA"). Under the COA, McAllister agreed to provide barges to move wood pulp from Scott's production facility in Nova Scotia to its manufacturing plant in Pennsylvania. Scott guaranteed a minimum monthly freight and could satisfy its guarantee by shipping other types of goods. In 1991, Scott could not meet the minimum freight requirement and arranged to meet its requirements by shipping the metal rebar of Metal Processing from New Jersey to Puerto Rico. The COA was still in effect at this time. With McAllister's consent, Scott entered into a separate contract with Metals Processing, using the Transportation Advisory Council as its broker. The COA between McAllister and Scott remained in place and governed the parties's relationship on the voyage from New Jersey to Puerto Rico.[2] Shipments of metal rebar commenced in September 1991. Both McAllister and Scott agree that the COA governs their rights and obligations but rely on different and conflicting provisions.[3] Scott argues essentially that the

1. The Court has diversity jurisdiction under 28 U.S.C. § 1332 and since the claims are admiralty or maritime in nature with the meaning of Fed.R.Civ.P. (h) the Court has admiralty and maritime jurisdiction under 28 U.S.C. § 1333. The charter of a tug and barge is of course a maritime contract. *Angelina Cas. Co. v. Exxon Corp. U.S.A. Inc.,* 876 F.2d 40 (5th Cir.1989).

2. This has been stipulated to by McAllister and Scott. The parties have also stipulated that the arbitration clause in Section 18 of the COA has been waived.

3. Section 13 of the COA provides as follows:
INSURANCE
(A) MCALLISTER agrees at its sole cost and expense to procure and continuously

maintain in full force and effect throughout the term of this Agreement, and with reliable insurance companies, the following minimum insurance coverage:

(a) Full form hull and machinery insurances in an amount equal to the full value of each vessel performing services hereunder using forms at least equivalent to the American Institute Tug Form (August 1, 1978) and the American Institute hull Clauses (June 2, 1977), including full towers and collision liability with the sister ship clause unamended and Charters limitation Clause deleted.

(b) Protection and Indemnity insurance on a form equivalent to SP including contractual and Crew Liability coverage with limits equal to the full value of the vessel with the Charter's Limitation Clause deleted.

(c) Excess Protection and Indemnity, collision liability and tower's liability insurance for the difference between the full value of the vessel and the sum of $20,000,000.

(d) Insurance to cover pollution clean-up liability, to statutory limits, including CERCLA and any liability for bodily injury and property damage caused by pollution, with limits not less than $20,000,000.

All deductibles under the foregoing insurance shall be for the account of MCALLISTER. All of the aforesaid policies shall name SCOTT, its affiliates and subsidiaries as Additional Assureds as its interests appear in this Contract, shall waive subrogation against such Additional assureds, and shall provide SCOTT thirty days notice of material change or cancellation or nonrenewal of the aforesaid coverages.

Prior to the commencement of any services by MCALLISTER pursuant to this Agreement, MCALLISTER shall secure and deliver to SCOTT certificates in duplicate evidencing that the foregoing insurance coverages are in full force and effect.

(B) SCOTT agrees at its sole cost and expense to procure and continuously maintain in full force and effect throughout the term of this Agreement the following minimum insurance coverages:

(a) Open cargo policy insuring against all risks of physical loss or damage from any external cause in the full amount of all cargo and equipment of SCOTT and its affiliates and subsidiaries.

(b) Statutory Worker's Compensation and Employer's Liability coverage with a minimum limit of $1,000,000.

All deductibles under the foregoing insurances shall be for the account of SCOTT. The aforesaid cargo policy shall name and shall waive subrogation against MCALLISTER, the Vessels and their owners, operators, master, and crew, and their respective underwriters. All of the aforesaid coverages shall provide that MCALLISTER receive thirty (30) days of notice of material change or cancellation.

Commencement of any services by MCALLISTER pursuant to the Agreement is conditioned on SCOTT securing and delivering to MCALLISTER certificates in duplicate evidencing that the foregoing insurances are in full force and effect.

(C) It is the intention of the parties hereto that all risks, incidents and claims, ordinarily and generally insurable in the trade, shall be, and are insured against under the insurances provided for herein, or otherwise provided by MCALLISTER and SCOTT with respect to the Vessels and the Cargo. It is agreed that should any act of SCOTT vitiate or invalidate any of the aforesaid policies of insurance, then SCOTT shall pay to MCALLISTER all losses, damages, and expenses sustained by MCALLISTER as a result thereof, and shall indemnify MCALLISTER against all losses, claims and demands which arise and which would otherwise have been covered by such insurance. It is further agreed that, should any act of MCALLISTER vitiate or invalidate any of the aforesaid policies of insurance, then, and only in that event, MCALLISTER shall pay to SCOTT all losses, damages, and expenses sustained by SCOTT as a result thereof and shall indemnify SCOTT against all losses, claims and demands which arise therefrom and which would otherwise have been covered by insurance.

Section 15 of the COA provides:

INDEMNITY

(A) Neither SCOTT, its officers, employees, nor the underwriters of any of the foregoing shall have any responsibility or liability for any claim involving damage to or loss of the Vessels or any of MCALLISTER'S equipment, or for any injury, illness disease, or death of employees of MCALLISTER, and MCALLISTER shall defend, indemnify, and hold harmless SCOTT, its officers and employees, and the underwriters of each of the foregoing from and against any such claim, whether groundless or not, and whether caused in whole or in part by the negligence or faults of indemnities. It is expressly understood that MCALLISTER shall insure its obligations under this paragraph.

(B) Neither MCALLISTER, or its officers, directors, employees, the vessels, her owners, operators, master, and crew, nor the underwriters of any of the foregoing shall have any responsibility or liability for any claim involving damage to or loss of any cargo and/or equipment carried by the Vessels or for any injury, illness, disease or death of employees of SCOTT, its subcon-

COA required McAllister to obtain certain insurance coverage, naming Scott as an additional assured with waiver of subrogation; McAllister failed to do so, and therefore McAllister's breach precludes recovery by McAllister and its underwriters. McAllister contends the responsibility for insuring the cargo was Scott's, and Scott was required to indemnify McAllister and its underwriters against any loss due to cargo damage or loss.

This opinion addresses McAllister's claim for contractual indemnity and, through McAllister, the underwriters' claim for subrogation against Scott. The findings of fact constitute the Court's final determination of contested factual issues and therefore supersede any prior recitation of facts contained in opinions previously entered on the docket for this matter. The Court makes these findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure.

To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## II. *Discussion*

### A. *Objections to Exhibits and Trial Testimony*

■ As a preliminary matter, the Court must determine whether to consider certain contested exhibits and testimony. Scott argues that the Court should not consider McAllister's Exhibits Numbers 11, 12, 13, 17, 18 and 19. Scott points out that McAllister did not produce those exhibits to Scott with those exhibits as required by the Pretrial Order. The requirements of the Pretrial Order are clear. McAllister does not dispute that it failed to comply with them. The Court will therefore not consider the disputed exhibits.

Scott has also made an objection to any testimony regarding the amount of the settlement paid to Metals Processing by McAllister and its underwriters. The Court does not understand the force of this objection, as Scott has already stipulated to the fact that McAllister and its underwriters paid $2,035,000 to Metals Processing as part of their settlement. Tr. Trans. at 18. Given this stipulation, the Court finds that the McAllister and its underwriters paid $2,035,000 to Metals Processing to compensate Metals Processing for cargo loss and damage.

### B. *Should the Case Be Dismissed Because McAllister Is Not The Real Party In Interest?*

■ After many settlement conferences with Magistrate Judge Cavanaugh, McAllister settled this matter with Metal Processing in the amount of $2,035,000. McAllister paid $200,811.23, representing its deductible under its Tower's Liability policy plus the amount due as a result of slow paying or bankrupt underwriters. McAllister's Protection and Indemnity ("P & I") underwriters, Steamship Mutual,

tractors, or their employees or agents, and SCOTT shall defend, indemnify, and hold harmless MCALLISTER, its officers, directors, employees, the Vessels, its owners, operators, master, and crew, and the underwriters of each of the foregoing from and against any such claim, whether groundless or not, and whether caused in whole or in part by the negligence or faults of indemnities or by unseaworthiness of the Vessels or equipment of MCALLISTER. It is expressly understood that SCOTT shall insure its obligations assumed under this paragraph.
Section 10 of the COA reads:
CARGO CLAIMS

Without restricting or limiting what otherwise would follow from the terms of this Contract with respect to Scott's duties and responsibilities and MCALLISTER'S duties and responsibilities, SCOTT shall be responsible for all claims for short delivery of cargo and all claims for damage to cargo resulting from improper handling or stowage, or resulting from the failure of SCOTT to make the Barges' cargo ready for sea in such respects as set out in Paragraph 6(D) hereof. SCOTT further undertakes to indemnify MCALLISTER against all costs, losses or expenses should MCALLISTER be required to defend or pay any such claims.

contributed $1,017,500 and McAllister's Tower's Liability Underwriters contributed $816,688.77. McAllister's payments to Metals Processing were part of an overall settlement package of $2,690,000 which includes the above payments plus payment by Raritan River Terminals of $305,000 and payment of New Jersey Steel of $350,000. Raritan River Terminals also paid $200,000 to the French Hull Underwriters, who had insured the barge. The Settlement Agreement was signed on June 18, 1998.

■ Scott argues that Rule 17(a) of the Federal Rules of Civil Procedure[4] requires the Court to dismiss the Complaint because McAllister is not the real party in interest with respect to payments made by McAllister's insurers to Metal Processing for its lost cargo. Scott argues that McAllister's underwriters are the real parties in interest; since they are not joined in the action, the action should be dismissed. Scott's argument is without merit. The facts here do not require or justify dismissal of the Complaint. The purpose of Rule 17(a) is to allow defendants to raise all of their defenses and to protect defendants from multiple suits. *Pace v. General Elec. Co.*, 55 F.R.D. 215, 217 (W.D.Pa. 1972). Scott is not at any risk of being sued again for McAllister's claim.

Up until the time that the Settlement Agreement was signed in June of 1998, McAllister was certainly the real party in interest. Scott argues that while preparing the Pretrial Order filed on August 21, 1998, it requested McAllister to provide the names and amounts paid by subrogated insurers, which McAllister failed to do. Scott further complains that McAllister did not amend the Pretrial Order to include the subrogated insurers as plaintiffs and has now waived its right to do so. But the case relied on by Scott, *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949), does not support its position. In that case the Supreme Court, responding to the defendant's argument that it was necessary to join the insured in the action, held that both parties were necessary; that is, the pleading should reflect each party's real interest in the action and suggested that the burden for joining the non-suing party was on the defendant. The Court stated that the defendant—the United States—could "upon timely motion" compel the joinder of the non-suing party. *Id.* at 382, 70 S.Ct. 207. The Court also found where there was partial subrogation to an insurer, neither the insured nor the insurer-subrogee was an indispensable party. *Id.* at 382 n. 19, 70 S.Ct. 207.

Rather than require dismissal of the action where the insured sues without the subrogated insurer, courts have held that where there is partial subrogation the insured may file suit in its own name for the entire amount of the claim, without naming the insurer as a co-plaintiff. *Virginia Elec. and Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78 (4th Cir.1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1450, 39 L.Ed.2d 493 (1974); *Garcia v. Hall*, 624 F.2d 150 (10th Cir.1980); *Wright v. Albuquerque Auto Tr. Stop*, 591 F.2d 585 (10th Cir.1979); *Baker v. Southern Pacific*

---

4. Federal Rule of Civil Procedure 17(a) provides:

Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

*Transportation,* 542 F.2d 1123 (9th Cir. 1976).

Subsequent to the trial, counsel for McAllister forwarded to the Court acknowledgments of the "Ratification of McAllister's Action" whereby McAllister's P & I Underwriters and Tower's Liability Underwriters ratified all actions taken by McAllister in this matter past and future, including the commencement of a cross-claim against Scott. The Ratification further authorized the continuation of this action, agreed that "McAllister may pursue any right that the P & I Club and Towers's Liability Underwriters have" against Scott and agreed to be bound by the result of this action and by all court orders action as if they were named parties.

Scott objects to this Ratification, arguing it has been sent to the Court too late, but Rule 17(a) expressly provides that no action shall be dismissed until reasonable time after objection has been given for ratification by the real party in interest. A plaintiff must have a reasonable opportunity to obtain ratification of the action from, or joinder or substitution of the real party in interest. *See Sun Refining and Marketing Co. v. Goldstein Oil Co.,* 801 F.2d 343 (8th Cir.1986). McAllister has obtained that ratification, and such ratification serves as a separate basis for not dismissing the complaint under Rule 17(a). The Court therefore concludes that Rule 17(a) does not require dismissal of the complaint.

### C. *Does Scott's Obligation to Indemnify McAllister Constitute A Valid Indemnity?*

Section 15 of the COA clearly provides that neither McAllister nor its underwriters shall have any responsibility for cargo loss and that Scott shall indemnify McAllister and its underwriters for such loss. Scott, relying on *Bisso v. Inland Water-*

*ways Corp.,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), argues that the indemnity clause is unenforceable because it is void against public policy. In *Bisso* the Supreme Court held that clauses in towage contracts that relieve a tower from its own negligence are void against public policy. The *Bisso* rule now has so many exceptions that its viability as a bright line rule must be questioned. However, it is unnecessary to try to determine whether the Third Circuit would feel constrained to follow the *Bisso* court's prohibitions or would, following the analysis under "benefit of insurance" agreements, permit allocation that best fits the contracting parties' needs;[5] a *Bisso* analysis is inappropriate as the contract between McAllister and Scott is a contract of affreightment, not a towage contract, to which *Bisso* does not apply.

Although Scott in its briefs refers to the COA as a towage contract, the parties themselves identified their agreement as a "Contract of Affreightment." When a tug and barge are owned by the same person and the contract is one to move cargo from one point to another, the contract is one of affreightment and not towage. See Parks, Alex L., THE LAW OF TUG, TOW AND PILOTAGE 43 (3d.Ed.1994); *Sacramento Navigation Co. v. Saltz,* 1927 A.M.C. 397, 273 S.S. 326 (1927). Since McAllister owned the tug and the barge, and contracted to move Scott's cargo, the contract—the COA—is a contract of affreightment.

The cargo carried under the COA was one of private, not common, carriage since the carriage was an entire vessel load for a single shipper. *See* Parks, *supra;* Schoenbaum, 2 ADMIRALTY AND MARITIME LAW § 10–3 (2d Ed.1994). Since the COA is a private contract of affreightment, the parties are free to allocate their respective rights and liabilities. *See* Schoenbaum, *supra; Caribe Tugboat Corp. v. J.D. Barter Const. Co., Inc.,* 509 F.Supp.

---

**5.** *Id.* at 377; *See, e.g., Twenty Grand Offshore, Inc. v. West India Carriers, Inc.,* 492 F.2d 679 (5th Cir.), *cert. denied,* 419 U.S. 836, 95 S.Ct.

63, 42 L.Ed.2d 63 (1974) (allocation of insurance obligations in towage contract not exculpatory clause subject to *Bisso* rule.)

312 (M.D.Fla.1981); *Kerr–McGee Corp. v. Law,* 479 F.2d 61 (4th Cir.1973).

■ Federal maritime law recognizes the right to contractual indemnity and that such indemnity extends to losses caused by the indemnitees' own negligence where, as with Section 15 of the COA, the intent is expressly provided for in the contract. *See Angelina Casualty Co. v. Exxon Corp. U.S.A., Inc.,* 876 F.2d 40, 42 (5th Cir.1989)

■ If Scott had shown that the COA was contrary to public policy as a result of an unconscionable disparity in bargaining positions, a colorable argument based on the *Bisso* rationale might apply, but Scott has made no such showing. *See Tenneco Oil,* 324 F.Supp. at 838. Absent such a showing the Court will follow those cases that restrict the application of the *Bisso* doctrine to towage contracts. *See Texas Co. v. Lea River Lines,* 206 F.2d 55 (3d Cir.1953); *Hercules, Inc. v. Stevens Shipping Co.,* 698 F.2d 726 (5th Cir.1983); *Kerr–McGee Corp. v. Law,* 479 F.2d 61 (4th Cir.1973); *Fluor Western, Inc. v. G & H Offshore Towing Co.,* 447 F.2d 35 (5th Cir.1971); *Mississippi Valley Barge Line Co. v. Inland Waterways Shippers Ass'n Inc.,* 289 F.2d 374 (8th Cir.), *cert. denied,* 368 U.S. 876, 82 S.Ct. 123, 7 L.Ed.2d 77 (1961); *Caribe Tugboat,* 509 F.Supp. 312; *Tenneco Oil Co. v. Tug Tony,* 324 F.Supp. 834 (S.D.Tex.1971); *Allied Chemical Corp. v. Gulf Atlantic Towing Corp.,* 244 F.Supp. 2 (E.D.Va.1964); *Pure Oil Co. v. M/V Caribbean,* 235 F.Supp. 299 (W.D.La.1964), *aff'd sub nom, Pure Oil Co. v. Boyne,* 370 F.2d 121 (5th Cir.1966).

The Court concludes therefore that Section 15 of the COA requiring Scott to indemnify and hold harmless McAllister and its underwriters for any claim for loss of cargo is valid and enforceable.

D. *Does the Contract of Affreightment Require McAllister to Name Scott As An Additional Assured on its Protection and Indemnity and Towers Liability Policies?*

■ Scott's principal argument in opposition to McAllister's claim for indemnity under Section 15 is that McAllister was obligated under Section 13 of the COA to get form hull and machinery insurance—including full tower's and collision liability—and P & I insurance. Scott argues that McAllister was also required to name Scott as an additional assured and to obtain a waiver of subrogation from McAllister's insurers. As a result of McAllister's failure to do so, Scott contends McAllister and its insurers are precluded from recovering under Section 15, which provides that Scott is liable for the cargo and responsible for indemnifying McAllister and its insurers for any loss of cargo. McAllister responds that it was not the intent of the parties that McAllister include Scott as an additional assured for cargo damage under Section 13 and its claim for indemnity rests on a separate, freestanding right to be indemnified under Section 15.

Section 13 clearly requires McAllister to include Scott as an additional assured on its P & I and Tower's liability policies as an additional assured. Scott urges the Court to reconcile the indemnity provision that renders Scott liable for cargo loss with the COA as a whole by interpreting it to mean that any cargo loss which McAllister's insurance does not cover is Scott's obligation. Therefore only to the extent that McAllister's insurance does not pay for the loss is Scott liable for cargo loss under the indemnity provision.

Scott is of course correct that courts often have to reconcile clauses that impose obligations to insure together with clauses to indemnify. Scott is also correct that contracts can require one party to be liable for the loss but require the other party to insure that loss, and failure to insure the loss can preclude recovery under a separate indemnity provision.

Scott relies on *Twenty Grand Offshore, Inc. v. West India Carriers, Inc.,* 492 F.2d 679 (5th Cir.1974). In this case, the owners of a barge sued the tugboat owner to

recover damage to the barge due to the tug's alleged negligence. The towage contract required the tug owner and the barge owner to insure their respective vessels and to get in each policy a waiver of subrogation and designation of the other party as an additional insured. The barge owner failed to obtain the required insurance which would have covered the tug owner's negligence and was precluded—along with the barge owner's insurance company—from recovering against the tug owner for its negligence.

Scott also relies on *Ogea v. Loffland Brothers Co.,* 622 F.2d 186 (5th Cir.1980). There the plaintiff sued the operator of an offshore drilling platform for personal injuries suffered when he slipped and fell on the platform. The operator filed a third-party complaint against the owner of the drilling platform seeking indemnity. The court held that the indemnity provisions had to be construed with the provision of the contract in which the operator had agreed to obtain a comprehensive general liability insurance policy to cover losses up to $500,000, naming the owner as co-insurer. This provision also required an endorsement waiving rights of subrogation against the owner.

The operator argued that the provisions of the contract requiring him to obtain insurance for the benefit of the owner should be ignored in the face of the indemnity provisions under which the owner agreed to indemnify the operator in all claims for personal injury. The court rejected this argument on the basis of the well-established tenet of contract interpretation that a contract should be viewed as a whole. The court concluded that under the contract the parties intended that the owner would not be held liable for injuries incurred on its off-shore platform up to the contractual limit of $500,000, and that the operator would obtain insurance to cover such damages. When damages were paid in excess of $500,000 the indemnity provisions would come into effect. If the intent of McAllister and Scott were similar to that of the *Loffland* or *Twenty Grand* parties, then McAllister would not be able to rely on the indemnity clause to relieve itself of the obligation to include Scott as an additional assured. Scott has not established, however, that the intent of the parties in this action was similar to that of the *Loffland* and *Twenty Grand* parties.

### 1. Scott's Argument

As the parties recognize, the critical factual issue for the Court to determine is the parties' intentions as embodied in the COA. Scott advances three arguments for its position: (1) the language of the COA on its face requires McAllister to name Scott as an additional assured and obtain waiver of subrogation from the insurers; (2) the testimony of Scott's Insurance Manager during the relevant time periods establishes that it was his understanding that Scott would have coverage identical to that of McAllister; (3) McAllister's shifting trial positions undercuts its credibility.

### a. Language of the COA

Unlike the cases previously discussed, the COA does not clearly allocate responsibility for the loss on Scott and responsibility for obtaining insurance for third party cargo on McAllister. Section 13 makes clear that: (1) McAllister will procure and maintain full form hull and machine insurance with "tower's and collision liability," and name Scott as an additional assured; and (2) Scott must procure and maintain an "open cargo policy" with waiver of subrogation against McAllister.

The parties agree that the open cargo policy was to insure only the wood pulp; that is, Scott's own cargo was the subject matter of the COA when the parties initially contracted. Nothing is mentioned in these Sections about who is responsible for insuring against the loss of third party cargo. What differentiates this case from those distinguishing the responsibility for insurance from responsibility for loss and indemnification is that Section 15 not only places the loss of the cargo on Scott but requires Scott to indemnify and hold

harmless McAllister *and the underwriters* with respect to any claim for loss of cargo, and requires Scott "to insure its obligations assumed under this paragraph."

Moreover, when speaking of cargo the language in the "INSURANCE" clause is different than that used in the "INDEMNITY" clause. Section 13 requires Scott to get an open cargo policy insuring the full amount of all "cargo and equipment of Scott" while Section 15 relieves McAllister and its underwriters for any claim involving damage to or loss "of *any cargo.*" (Emphasis added.) The language of the COA does not support Scott's interpretation; instead it requires Scott to be responsible for its own cargo under the insurance clause and third party cargo under the indemnity provision.

### b. *Testimony of Richard A. Yost and Beverly Reilly*

### I. *Richard A. Yost*

Scott does not provide an adequate construction of the clause designating Scott as responsible for "loss of any cargo," which would appear to contradict Scott's contention that McAllister had to insure third party cargo under its Tower's and P & I policies. Instead, Scott relies on the testimony of Richard A. Yost, Scott's Insurance Manager, as to what was the intention of the parties.

Yost, a former Scott employee, testified by video deposition that at the time of the accident he was risk manager at Scott responsible for property, liability and marine insurance. Yost testified in essence that it was his understanding that Scott

was to be named as an "additional assured" with a "waiver of subrogation" in the P & I and Tower's Liability policies. Yost was asked:

Q. Was it your understanding that Scott's coverage would differ in any way from McAllister's coverage in those policies in Sections 13(A), subparts (a) through (d)?

A. Not to my knowledge.

Yost Dep. at 23. The Court does not credit Yost's testimony to the extent that he says that the parties agreed that McAllister was responsible for insuring loss to third party cargo.[6] In fact Yost never exactly says that. Instead he says that the parties intended that Scott would be insured for the same loss that McAllister was required to insure against. That is a different matter altogether.

In addition, the Court must take into account Yost's role in negotiating the terms of the COA. Contrary to the assertion that he negotiated the insurance terms, Yost testified to a much more limited involvement:

Q. Mr. Yost, did you have any involvement with respect to the preparation and negotiation of a contract with McAllister Brothers that was entered into in December 1987?

A. I was asked to participate as part of the Scott Paper team that worked on the contract with McAllister specific to the insurance coverages we thought we should ask McAllister to provide, as well as what insurance coverages Scott Paper

---

6. In assessing the credibility of each witness in this case, the Court has taken into consideration how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness's testimony was considered in light of all the evidence in the case. 9A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2585 (2d ed.1955); see also *Miller v. Mercy Hospital, Inc.*, 720 F.2d 356, 365 (4th Cir.), *cert. denied*, 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985) ("Credibility involves more than a witness's demeanor and comprehends an overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence" and whether the witness's testimony was contradicted by what that witness had said or done at another time, by the testimony of other witnesses, or by other evidence).

Company would provide as part of that contract.

Yost Dep. at 12–13. When asked who at McAllister was actually negotiating on its behalf the terms and conditions of the contract he responded that he had "no idea" since he had not met with any of the McAllister people. *Id.* at 14. When asked who at Scott was responsible for the negotiation of the terms and conditions of the contract, he ·responded that it was the transportation group and the in-house legal people at Scott. *Id.* at 14–20.

To the extent that Yost's testimony supports the contention that McAllister was responsible for providing insurance coverage to Scott for cargo, his testimony is unpersuasive. Under Section 13, McAllister was required to get hull insurance, "full tower's and collision liability" insurance and P & I insurance. This insurance, however, must have been for the vessel-related liability since, under the terms of the COA, McAllister was not responsible for cargo loss. Under Yost's interpretation, the COA would require McAllister to provide insurance for cargo despite the provisions which put that responsibility on Scott, and also require Scott to provide indemnification for McAllister for cargo loss.

Of course the question to be resolved is what the parties to the COA intended, not what Yost intended. In that respect his testimony is of limited value since he testified that he did not participate in the negotiations of the terms and conditions of any of the other sections or provisions of the contract. Yost Dep. at 16. When asked about Section 15, he testified that it was not a section that he had any dealings with. *Id.* at 30. He further testified that he did not understand how the indemnity section "works in this very general language versus the specific covers that were required under section 12 that both parties agreed to provide, naming each other as additional insured under our respective coverages that we were to provide, and

that we were to waive subrogation." *Id.* at 39.

Yost is certainly correct that Scott was entitled to the same coverage as an additional assured with respect to the insurance McAllister was required to provide. Yost was asked the following question:

Q. When you first got on the team and read the insurance clause, was it basically your general understanding that the deal concerning the ATLANTIC TRADER was that McAllister would be responsible for hull and Scott would be responsible for its cargo?

A. Scott Paper would be responsible for its cargo.

It is only with respect to the insurance for which McAllister was responsible that Scott is entitled to be named as an additional assured with waiver of subrogation. Section 13 does not require McAllister to provide coverage for cargo. Yost does not shed light upon the issue that Scott has never adequately explained: why, if Scott was responsible for insuring its own cargo, should McAllister be obligated to insure cargo that was not Scott's? Given the absence of an adequate explanation, the Court must rely on the language of the COA.

### ii. *Beverly Reilly*

McAllister called as its witness Beverly Reilly, currently the Vice President of Finance, who has been with McAllister for twenty-four years. Scott asks the Court to discount her testimony because she did not specifically participate in the negotiations with Scott with respect to either the insurance provisions or the indemnity provisions of the COA and that prior to 1993 she had no responsibilities for insurance at McAllister.

On the other hand Reilly did have personal knowledge of the COA. She was involved in the financing and the COA in 1987 and had the opportunity to review the insurance and indemnity clauses. Tr. Trans. at 23. She had worked with Larry Chan, John Norrod and Glen Oxton "in

putting this together." John Norrod was the vice president at the time who dealt directly with Duffy at Scott in negotiating the COA and Glen Oxton was McAllister's attorney responsible for drawing up the COA. Reilly testified that her involvement was not just with finance but also insurance, and she had been involved with insurance on and off since the time she came with McAllister in 1974. Tr. Trans. at 36.

The Court finds that Reilly had sufficient personal knowledge to testify with respect to the COA and the obligations the COA placed on the parties with respect to obtaining insurance to cover third party cargo. She credibly testified that under the COA, since Scott arranged to transport the cargo of Metal Processing, Scott should have arranged to get insurance coverage for the cargo. Tr. Trans. at 83.

### c. McAllister's Shifting Trial Tactics

Scott asks the Court to consider McAllister's shifting trial tactics and failure to comply with court orders in assessing the credibility of McAllister's witnesses. First, Scott notes that at the outset of the litigation McAllister brought a cross claim against Scott seeking damages to the hull of the Barge ATLANTIC TRADER. When Scott filed a motion for summary judgment, McAllister submitted the affidavit of John F. Lowe, which stated that the COA did not apply with respect to the voyage from New Jersey to Puerto Rico. The evidence of this affidavit required that the Court deny Scott's motion. After two years of discovery, Scott again moved for summary judgment, and for the first time McAllister reversed positions and conceded that there was no claim against Scott for hull damages. Later, McAllister submitted the declaration of Lawrence Chan, Executive Vice President, the import of which was diametrically opposed to the Lowe Affidavit. The Court on March

27, 1998 dismissed the cross claim for hull damages as to McAllister and French Hull Underwriters. McAllister has now stipulated that the COA governs the rights of the parties with respect to this cargo loss.

Scott is certainly justified in its frustration with McAllister's shifting moves.[7] While the Court does not countenance such maneuvers, it cannot, however, draw from them the adverse inference that Scott suggests in view of the Court's determination of the credibility of the witnesses at trial and its own independent examination of the COA. The Court therefore declines to find McAllister's witnesses, specifically Reilly, not credible as a result of McAllister's trial tactics.

### 2. McAllister's Position

In support of its position that the COA requires Scott to be responsible for paying all cargo claims arising out of the COA, McAllister points to Section 15.[8] Scott argues that Section 13 of the COA defeats McAllister's claim.

Of course the starting point in determining whether Scott is required to indemnify McAllister is for the Court to ascertain the intent of the parties as expressed in the COA. *Dome Petroleum Ltd. v. Employers Mutual Liability Insurance Co.*, 767 F.2d 43, 47 (3d Cir.1985). There is nothing ambiguous in the language of Section 15: "Neither MCALLISTER ... nor the underwriters ... shall have any responsibility or liability for any claim involving damage to or loss of any cargo ... carried by the Vessels...." Nor is there anything ambiguous in the language of the last sentence of this paragraph: "[i]t is expressly understood that Scott shall insure its obligations assumed under this paragraph."

Like any contract, the COA should be interpreted to give effect to the intent of the parties and to all provisions of the agreement. *Siegel Transfer, Inc. v. Carri-*

---

7. In addition, there was a change of counsel in the litigation and it is impossible to determine how much responsibility for the shifting positions rests with counsel and how much rests with McAllister.

8. The parties agree that Section 10 only applies to Scott's own cargo and not to third party cargo.

*er Express, Inc.*, 54 F.3d 1125 (3d Cir. 1995). The Court concludes that the parties intended that Scott be responsible for all cargo loss whether the cargo was its own or that of a third party. Scott was responsible for insuring its own cargo under Section 10 and for insuring its indemnification of McAllister for any third party cargo loss under Section 15. The insurance provisions under Section 13 required McAllister to insure against loss or damage to its vessels but did not require McAllister to insure cargo—either Scott's or that of a third party. Nothing in the COA indicates an intent that McAllister was to insure the cargo that it was transporting for Scott.

There is no ambiguity on the face of the document. If there is any ambiguity, it arises from argument of counsel and not from the language of the COA. To the extent that there is any ambiguity the COA should be interpreted so that effect is given to all provisions of the agreement. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125 (3d.Cir.1995). If McAllister were obliged to include Scott as an additional assured for cargo damage under its hull insurance and P & I policies, Scott's responsibility under the COA for indemnification and insurance for cargo loss becomes redundant. Scott's interpretation would require McAllister to insure the very claims for which Scott agreed to indemnify McAllister. Such an absurd result convinces the Court that it is not what the parties intended. If there is a conflict between Sections 13 and 15, and the Court is not convinced that there is, the only interpretation that gives effect to both sections is that McAllister's obligation to provide hull and P & I insurance was never intended to encompass cargo claims. *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir.1986); *City of Columbia v. Paul N. Howard Co.*, 707 F.2d 338 (8th Cir.), *cert. denied*, 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983).

A reading of the entire COA leads the Court to the conclusion that under all circumstances McAllister was responsible for loss to the vessels while Scott was to remain responsible for loss of the cargo. Since it was not the intent of the parties that McAllister provide in any form cargo insurance for Scott, Scott's theories of liability must fall. Even if McAllister did breach its obligation to provide insurance for Scott, since its obligation did not extend to cargo insurance, its indemnity claim is not precluded. By the same reasoning, McAllister's insurers are also not precluded from enforcing the provisions of the indemnity agreement, under which Scott agreed that McAllister's underwriters would have no liability for any claim for cargo loss.

E. *Is Scott an Additional Assured under McAllister's Policies, and are McAllister's Underwriters Therefore Precluded from Pursuing this Action?*

Scott also raises the alternative argument that Scott is an additional assured under McAllister's policies and therefore cannot be sued by the McAllister's underwriters.

1. *McAllister's Admission of Scott as an Assured*

Scott argues that Scott either is or should be deemed to be an additional assured in McAllister's policies. If that is so, Scott argues, then McAllister's underwriters may not recover against Scott since no right of subrogation can rise in favor of the insurer against its own insured. 16 COUCH ON INSURANCE § 61:136.

Scott argues that "McAllister has admitted that Scott should have been named under the terms and conditions of the contract as an 'additional assured' with a 'waiver of subrogation' on the P & I policy and the Tower's Liability policies of insurance." Post-trial Br. at 32. The Court was not provided with this admission; it is apparently ambiguous as the Pretrial Order does not include such an admission. Instead the Pretrial Order raises this as

an issue to be decided by the Court.[9] The uncertainty about what McAllister admitted makes the "admission" useless. The Court does suspect that McAllister admitted that it should have named Scott as an additional assured on its Towers Liability and P & I policies. This is consistent with the trial testimony of Reilly that McAllister was to name Scott as an additional assured, with a waiver of subrogation, on both the P & I and Tower's Liability policies. Tr. Trans. at 25, 64. Reilly, however, was simply parsing the requirements of the COA. The COA required McAllister to get insurance for hull, tower's liability and P & I. It did not require McAllister to get insurance to cover cargo damage. Reilly admitted that Scott had been named as an additional assured with waiver of subrogation on the tower's liability policy, but testified that a mistake had been made and when the McAllister Sisters was put into service, Scott wasn't included as an additional assured. Tr.Trans. at 64–65. Reilly's testimony contradicts Scott's unsupported assertion that Scott was an additional assured at the time of the accident, and the Court finds her testimony to be credible.[10] McAllister's underwriters are therefore not prevented from filing a claim for indemnity.

2. *The Effect of McAllister's Failures to Comply With the Pretrial Order and Discovery Orders*

■■■ Scott also argues that McAllister's failure to comply with discovery orders and to name the subrogated insurers in the Pretrial Order has irreparably prejudiced Scott in this litigation. McAllister ignored the directives of Magistrate Judge Cavanaugh, which required that all insurance policies and documentation be provided to all parties in the litigation. After discovery had been completed and expert

witnesses deposed, Scott moved to preclude testimony and evidence with respect to the P & I policy. Magistrate Judge Cavanaugh filed an opinion on December 19, 1997, later affirmed by this Court, that granted Scott's request and precluded McAllister from offering into evidence the P & I insurance policy and "any testimony as to the terms and conditions of the Protection and Indemnity policy, coverages or other related issues on the basis that the policy was never produced, pursuant to the order of this Court." Scott also legitimately complains about McAllister's refusal to provide copies of exhibits listed in the Pretrial Order by McAllister and to provide production of the Tower's Liability policy.

Scott argues that the failure to produce the policies in discovery allows the Court to infer that Scott was named as an additional assured. It is, however, one thing to penalize McAllister for serious discovery violations by precluding proof at trial, but it is an entirely different matter to then argue that the Court must infer that Scott was named as an assured. When Reilly attempted to discuss the P & I policy Scott's counsel objected, so it was impossible to know whether Scott was or was not named as an assured. However, Reilly did testify about a tower's liability policy, and stated that it did not include Scott as an additional assured. The Court cannot infer, in light of this testimony, that McAllister was named as an additional insured. Magistrate Judge Cavanaugh granted Scott's own request that all evidence which would settle this issue be precluded; Scott however, must establish this affirmative defense. By precluding the introduction of the documents which would have settled the issue and failing to rebut

9. The Pretrial Order, List of Legal Issues, provides under Scott's List:
18. Did McAllister admit in its Response to Scott's Request for Admissions that Scott was an additional assured with a waiver of subrogation with respect to the Tower Liability policy?

*Id.* at ¶ 18. *See also id.* at ¶¶ 19–21.

10. Since McAllister was not required to provide cargo insurance for Scott's benefit, not failing to include Scott after first including Scott has no legal consequences.

Reilly's testimony, Scott has failed to establish that it was an additional insured.

In addition, Scott is not prejudiced by McAllister's flagrant disregard of the Court's discovery orders in this regard because the only inferences the Court could draw would be that (a) Scott was in fact named at one time as an additional assured and for whatever reason was not included as an additional assured at the time of the accident, or (b) that Scott is an additional assured today.

In either event, the inferences cannot serve to defeat McAllister's claim for indemnity. If Scott was at one time included, but not included at the time of the accident, Scott would not be entitled to relief because McAllister had no obligation to include Scott as an additional assured with respect to cargo damage. If Scott were in fact included, that could not preclude McAllister's underwriters from relief because under the COA McAllister was not required to include Scott. The parties did not intend that McAllister arrange for insurance for Scott as an additional assured with respect to cargo loss. The parties did intend that Scott be responsible for cargo loss for "any cargo", indemnify and hold harmless McAllister's insurers, and insure the indemnification. It would contradict the terms of the COA to permit Scott to defeat the indemnification obligation by the fluke of having been included as an additional assured for the cargo when the parties never intended that to be a requirement under the COA.

The Court does not feel compelled to draw the inference requested, and determines that in light of the parties' intention that Scott be responsible for the cargo and insuring its loss, such an inference is not warranted. Even if such an inference were warranted, however, it would not serve to defeat McAllister's claim for indemnity.

F. *Is Scott Liable for the Amount of the Settlement made by McAllister?*

Scott has also argued that it is not responsible for indemnifying McAllis-

ter for the amount of the settlement since McAllister has not established that the settlement was reasonable. As a general rule, the party seeking indemnity must establish that the settlement was reasonable. When the liability which imposes the duty to indemnify arises as a matter of law, the indemnitee must prove it was actually liable to the party it settled with in order to claim indemnification. *M & O Marine, Inc. v. Marquette Co.,* 730 F.2d 133, 135 (3d Cir.1984). Scott argues that McAllister has not established that McAllister was *actually* liable to the parties with which it settled, and therefore the settlement is not reasonable.

The Third Circuit has held that, where there is an express contractual obligation to indemnify, the question of whether actual liability is a prerequisite to the duty to indemnify is determined by reference to the parties' intent, as embodied in the language of the indemnity provision of the contract. *Bainville v. Hess Oil V.I. Corp.,* 837 F.2d 128, 131 (3d Cir.1988). The *Bainville* court also found that other equitable considerations that govern indemnification liability, such as the right of the indemnitor to approve the settlement and the effect of having no duty to defend the action, do not apply when indemnification is imposed through an indemnity clause in a contract. *Id.* at 132.

In this action, the provision of the COA which places responsibility for indemnity for cargo damage on Scott reads, in part: "SCOTT shall defend, indemnify, and hold harmless MCALLISTER ... and [its] underwriters ... from and against any such claim, *whether groundless or not,* and whether caused in whole or in part by the negligence or faults of indemnities or by unseaworthiness of the Vessels or equipment of MCALLISTER." (Emphasis added.) The COA language clearly provides that Scott indemnify McAllister for all claims for cargo damage regardless of whether the claims have merit—that is,

regardless of whether McAllister is actually liable. Given the clear language of the COA, the Court finds that McAllister need not show it was actually liable in order to claim indemnity for its settlement from Scott. Scott is therefore liable to McAllister for the full sum of the settlement.

 In addition, since the issue was not preserved by Scott in the Pretrial Order, Scott has waived the right to contest the reasonableness of the settlement in its arguments at trial. "It is, of course, established law that a Pretrial Order when entered limits the issues for trial and in substance takes the place of pleadings covered by the Pretrial order." *Basista v. Weir,* 340 F.2d 74, 84 (3d Cir.1965); *See also Kline v. S.M. Flickinger Co.,* 314 F.2d 464, 467 (3d Cir.1963) (finding district court did not err in restricting issue of negligence to issues raised in pretrial order, and, when plaintiffs sought to introduce another issue of negligence not raised in the order, court gave them alternative of having case go to jury solely on the first issue or to have court declare mistrial at their expense and retry case, and plaintiffs elected to take first alternative); *United States v. An Article of Drug, Acnotabs,* 207 F.Supp. 758, 767 (D.N.J.1962) (refusing to allow the determination at trial of an issue not raised in the pre-trial order). A court which requires a party to disclose the theories underlying their claims or defenses may preclude a party from introducing evidence on a claim or defense which is not revealed. The application of preclusion is always a matter of judicial discretion. If the issue was within the knowledge of the party seeking to introduce it, or if inclusion would place a great burden on the opposing party, then the introduction of the issue should not be allowed. 6A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1527. Although Scott did not have access to the settlement agreement itself, it was aware that McAllister had settled. If it wished to preserve the issue of the reasonableness of the agreement for trial, it should have raised the issue in the Pretrial Order.

### G. Pre–Judgment Interest

 McAllister also contends that it is entitled to prejudgment interest. Prejudgment interest is generally awarded in admiralty cases involving indemnity. "The rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable." *Cooper v. Loper,* 923 F.2d 1045, 1051 n. 6 (3d Cir.1991). Since prejudgment interest is considered compensatory, not punitive, courts may refuse to grant a party prejudgment interest only in "exceptional circumstances." *In re Bankers Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981), *cert. denied sub nom., Bankers Trust Co. v. BP Oil, Inc.,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982).

 According to the Third Circuit, there are three situations in which a court may refuse to grant a party prejudgment interest: where the party requesting the interest has (1) unreasonably delayed in prosecuting its claim; (2) made a bad faith estimate of its damages that precluded settlement; or (3) not sustained any actual damages. *In re Bankers Trust Co.,* 658 F.2d at 108, *cited with approval in, Bermuda Express, N.V. v. M/V Litsa,* 872 F.2d 554, 564 (3d Cir.), *cert. denied sub nom., M/V Litsa v. Southeastern Maritime Co.,* 493 U.S. 819, 110 S.Ct. 73, 107 L.Ed.2d 40 (1989). The denial of prejudgment interest for "delays in the resolution of the case" may be denied only when the delays are "directly attributable to the party claiming interest." *Id.* at 109. If the Court finds that such circumstances exist, it has discretion to deny prejudgment interest. *Id.* at 108.

The Court finds that a denial of prejudgment interest is warranted in this case. This denial results from McAllister's unreasonably delaying the resolution of this case. As noted above in Section C, McAllister indulged in shifting trial tactics—

most notably the diametrically opposed positions of the Lowe Affidavit and McAllister's later position that the COA does govern this claim—and failures to comply with court orders in its prosecution of this case. These tactics resulted in considerable delays, delays which are directly attributable to McAllister. For this reason, the Court exercises its discretion to deny McAllister prejudgment interest.

### Conclusion

For the foregoing reasons, the Court finds that the Defendant Scott Paper Company is **liable** for the amount of $2,035,000 under the Contract of Affreightment. Furthermore, the Court finds that Scott is **not liable** for pre-judgment interest on this award. An appropriate order follows.